Filed 4/16/25  Lee v. Lee CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| JACK LEE, Individually and as Cotrustee, etc.,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CHENG-CHIE LEE,<br><br>    Defendant and Appellant. | G063374<br><br>(Super. Ct. No. 30-2020-01146084)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Ebrahim Baytieh, Judge. Affirmed.

Murtaugh Treglia Stern & Deily and Devin E. Murtaugh for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

\*                \*                \*

Appellant herein, Cheng-Chie Lee, who goes by the nickname "Jeff," contests findings made after a bench trial on competing petitions filed by himself and his older brother regarding assets in their parents' trust. Jeff's[1] petition sought to invalidate a trust document which disinherited him. His brother, Jack, responded with a petition seeking to invalidate a contract by which their parents were to pay a loan secured by a home the parents had gifted to Jeff.

The trial court determined that both brothers had unduly influenced their elderly parents into signing documents that benefitted them, and therefore granted both petitions. Jeff appeals the decision as to Jack because he contends the trial court failed to consider or dispose of Jeff's affirmative defenses of statute of limitations, laches, and lack of standing.

We conclude the trial court's findings of fact and its statement of decision indicate it considered these defenses and properly determined they lacked merit. We therefore affirm the judgment.

STATEMENT OF FACTS[2]

Ju-Long and Sue May Lee (hereinafter collectively, the Lees) moved to the United States from Taiwan in 1974 with their four children: Susan, Jack, James, and Jeff, the youngest. The Lees were fluent in Taiwanese, Mandarin, and Japanese, but not English. They therefore relied heavily on their children to assist them in conducting financial business. As

[1] We refer to individual Lee family members in this opinion by their first names only for purposes of clarity.

[2] Because Jeff does not substantively challenge the trial court's factual findings, we derive the majority of the facts from the revised final statement of decision and judgment entered by the court herein on October 18, 2023.

they grew older, the four children began alternating staying one week each with the couple to assist them with their needs. After Susan began experiencing health issues, she dropped out of the arrangement, and the three brothers assumed weekly shifts staying with their parents.

The Lees accumulated substantial assets in Taiwan and in the United States over their lifetimes. The couple, especially Sue May, became interested in real estate investing after they immigrated to this country, and Jeff helped her in this pursuit.

The Lees hoped to leave their estate to their children in equal shares. In 1992, they executed a living trust for this purpose. The couple transferred into the trust a house they had purchased in Rancho Santa Fe in 1989 (hereinafter, the Rancho property).

Around 2004, Jeff was going through divorce proceedings and he moved into the Rancho property. He paid his parents $10,000 per month in rent, but they were simultaneously depositing the money in an overseas bank account they had established.

In 2007, the Lees obtained a $1 million residential mortgage loan secured by the Rancho property. The proceeds of the loan were used to fund construction of Ju-Long and Sue May's dream home in Newport Coast, which the parties refer to as "Skyridge." Jeff claims he was heavily involved in the construction at Skyridge.

Once Jeff's divorce was finalized in 2011, the Lees gave Jeff the Rancho property outright rather than transfer the money in the overseas account back to him. However, Jeff testified, his parents told him they would continue to be responsible for paying the Skyridge loan.

Jeff had an agreement drafted, the "repayment agreement," whereby his parents agreed that Jeff was receiving the Rancho property free

3

and clear of the loan. Jeff testified that he was in possession of the original document, and a copy of it was entered into evidence.

The document states that it was "made as of March 16, 2011," and is signed by Ju-Long, Sue May, and Jeff. The stated consideration for the Lees' promise was that Jeff would "allow[] the Real Property to continue to be used as collateral for the Loan, so that the Loan [would] not have to be prepaid" by them. The document further stated that if the deed of trust was not released from the Rancho property on or before the Lees' deaths, the loan obligation was to be imposed on their living trust, and was to be paid as an estate obligation prior to any distributions to beneficiaries.

Despite the purported March 16, 2011 effective date of the agreement, the trial court found Jeff had taken "steps consistent with him being responsible for the repayment of the Loan." The trial court noted Jeff had never told his siblings about the existence of the written repayment agreement. It further noted the evidence showed Jeff was trying to secure his own financing to pay off the Skyridge loan. Indeed, the court observed that Jeff communicated with a mortgage loan specialist on March 21, 2011–five days after the agreement's effective date–to say he would secure financing to pay off the majority of the loan once title had transferred to him. Susan's testimony corroborates this; she testified Jeff continually agreed to assume the loan, but whenever the siblings decided on an arrangement for him to do so, he would reject the proposal.

The repayment agreement bears a notary stamp dated January 3, 2012, almost a year after the agreement's effective date. At trial, Jeff testified that he drove his parents to a Wells Fargo Bank to sign both the repayment agreement and an amendment to the Lees' living trust before a notary public. The trust amendment stated that Jeff's share of the trust

4

estate should not be adjusted based on the Lees' agreement to repay the loan on the Rancho property. Jeff testified that he could not recall whether anyone translated the documents to the Lees before they signed. He also could not recall which attorney had drafted the repayment agreement.

On May 8, 2011, at a Mother's Day family get-together, the Lees informed their other children that they had transferred the Rancho property to Jeff. The other three siblings were distressed by this news. From that point on, the court found, Jack began what the court called "an unrelenting campaign of pressure and influence to equalize what [Jack] saw as an unfair gift to Jeff." Sue May required mental health treatment for stress and anxiety from the resulting family conflict.

In 2012, Jack and Susan brought their parents to attorney John Chang, whose law firm represented Susan in connection with her estate planning. Chang spoke Mandarin and so could communicate easily with the Lees. The Lees told him they wanted to leave their estate equally to their children, but they did not want to be responsible for the Skyridge loan. Chang drafted and on December 11, 2012, the Lees executed an irrevocable trust document which intentionally disinherited Jeff. The document named Susan and Jack as cotrustees.

The Lees continued to keep the Skyridge loan current. In 2019, at the age of 95, Ju-Long passed away. Sue May survives him, but at the time of trial, she was around 95 years old herself, and could not testify. As of the date of trial, Jeff remained living at the Rancho property.

## PROCEDURAL HISTORY

In May 2020, Jeff filed a petition to determine the validity of the 2012 irrevocable trust and to enforce the repayment agreement. Jack filed objections to the petition as well as a counter petition seeking rescission of the repayment agreement based on undue influence, amongst other things.[3] Susan filed a joinder to Jack's objection to Jeff's petition.

Jeff filed his own objections to Jack's petition. Among the affirmative defenses Jeff asserted were the statute of limitations, laches, and lack of standing. Jeff alleged that the Lees knew at least as of 2012 that they had a cause of action for rescission against him and that there was a time limit to bring that claim in court. Jeff also alleged that Jack lacked standing to object to the repayment agreement on Sue May's behalf, because she was still alive. Jeff brought a motion for summary judgment based on the three-year statute of limitations under Code of Civil Procedure section 338, subdivision (d). In denying Jeff's motion, the trial court stated he had failed to show that his parents were aware, on or before April 26, 2018, that they had been induced to sign the repayment agreement by fraud.

After a bench trial on Jeff and Jack's competing petitions, the trial court issued a statement of decision granting both petitions and invalidating both the 2012 irrevocable trust and the repayment agreement. The court found both Jeff and Jack had procured their respective documents by unduly influencing their parents.[4] As for Jeff's affirmative defenses, the court stated that it had "considered all such defenses and legal arguments,"

---

[3] The operative petition by Jack is the second amended petition filed August 19, 2022.

[4] Jeff does not contest the court's undue influence findings.

and found that "based on the factual findings made by the court, and based on the totality of all the evidence, none of these defenses and/or legal arguments are persuasive or applicable to change the conclusions reached by the court as detailed in this Statement of Decision."

Jeff filed objections to the statement of decision, asking the court to further detail its disposition of the affirmative defenses, but the court declined.

DISCUSSION

I.

STANDARD OF REVIEW

On appeal, Jeff argues the trial court should have denied Jack's petition based on his affirmative defenses of statute of limitations, laches, and lack of standing.

"Where the facts are undisputed, the effect or legal significance of those facts is a question of law. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799.) We review any questions of law de novo. (*Id.* at p. 801.) We review findings of fact for substantial evidence. "'In general, in reviewing a judgment based upon a statement of decision following a bench trial, 'any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision. [Citations.]' [Citation.] . . . "The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case."'" (*Gomez v. Smith* (2020) 54 Cal.App.5th 1016, 1026–1027.)

## II.

### THE TRIAL COURT PROPERLY CONCLUDED NONE OF APPELLANT'S AFFIRMATIVE DEFENSES HAD ANY MERIT BASED ON ITS FACTUAL FINDINGS

Jeff's central thesis is that the trial court's factual findings as provided in the final statement of decision were insufficient to resolve his three main affirmative defenses. Indeed, he suggests that the trial court left his affirmative defenses "unresolved." But a careful reading of the statement of decision shows clearly that the trial court *did* consider Jeff's defenses. It just rejected them. And the basis for its rejection is made manifest in its discussion of the facts and law.

### A. *Statute of Limitations*

Jeff's statute of limitations argument is premised on the fact that his parents consulted with a number of attorneys over the years who reviewed the repayment agreement. Most notably, Jeff's parents sought the advice of an attorney in 2012 who wrote an opinion letter regarding their agreements with Jeff. This attorney stated that, while he understood the Lees did not wish to "pursue any legal remedies to challenge those agreements," he felt the agreements might be vulnerable to judicial attack if they chose to do so. He cautioned that there were "time limits within which any such actions must be filed, and although they vary, and again will depend upon the facts, the most obvious time limit would be three years from date of the transaction." Assuming the Lees understood the content of this letter, it is evidence that attorneys attempted to make them aware that they had three years to file suit in order to invalidate the agreements.

But Jack asserted that the statute of limitations was tolled because Jeff continually behaved in a way that was inconsistent with the repayment agreement. Jack appears to have been arguing that Jeff was

equitably estopped from asserting the statute of limitations as a defense because his own conduct induced the Lees not to sue. "One aspect of equitable estoppel is codified in Evidence Code section 623, which provides that '[w]henever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it.' (See *DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd.* (1994) 30 Cal.App.4th 54, 60.) . . . ""Where the delay in commencing action is induced by the conduct of the defendant it cannot be availed of by him as a defense."" [Citations.]" (*Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 384.)

The trial court found merit in this theory, stating: "The evidence presented during the trial establishes that at different points in time Jeff took steps consistent with him being responsible for the repayment of the Loan." This included hiding the agreement from his siblings and seeking his own financing to pay off the loan. The trial court's statement shows it felt Jeff's own conduct had induced his parents into thinking he would not be enforcing the agreement and that he was therefore estopped to assert the statute of limitations as a defense.

The trial court's finding that Jeff exerted undue influence on his parents to sign the repayment agreement also militates against allowing him to use the statute of limitations as a shield in this action. "Just as the statute of limitations does not run against an action based on fraud so long as the fraud remains concealed, so ought the statute to be tolled even after the fraud is discovered, for so long as the sheer economic duress or undue influence embedded in the fraud continues to hold the victim in place." (*Wyatt v. Union*

*Mortgage Co.* (1979) 24 Cal.3d 773, 788, italics omitted.) Surely, this principle would apply to the Lees based on the trial court's factual findings.

## B. Laches

"'"The defense of laches requires unreasonable delay plus either acquiescence in the act about which plaintiff complains or prejudice to the defendant resulting from the delay." [Citation.]' (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 68.)." (*Drake v. Pinkham* (2013) 217 Cal.App.4th 400, 406.) The premise of Jeff's laches defense is that the delay in rescinding the repayment agreement resulted in the loss of witnesses, including his father, and Sue May, who was very old by the time of trial.

However, like the statute of limitations, a defendant may be estopped to assert laches as a defense where his conduct induces the plaintiff to postpone efforts to rescind an agreement. (See *Cooper v. Huntington* (1918) 178 Cal. 160, 164.) And, like Jeff's statute of limitations defense, this appears to be the trial court's conclusion.

## C. Lack of Standing

Jeff argues that Jack may have had authority to act for Ju-Long's estate as a co-executor, but he lacked standing to rescind the repayment agreement on Sue May's behalf. He further argues that Jack lacked personal standing to challenge the repayment agreement as a trust beneficiary because any such standing would have been established under the Probate Code, and Jeff claims Jack did not raise any claims under the Probate Code.

The record does not demonstrate that Jack ever claimed to have standing on Sue May's behalf; rather, his filings show Jack brought his petition as co-executor of Ju-Long's estate. "A party to a contract" can rescind "[i]f the consent of the party rescinding, *or of any party jointly contracting with him*, was . . . obtained through duress, menace, fraud, or undue

10

influence, exercised by or with the connivance of the party as to whom he rescinds . . ." (Civ. Code, §1689, subd. (b)(1), italics added.) Here, Jack sued on Ju-Long's behalf to rescind the agreement because both he and Sue May's consent was obtained through undue influence. And the trial court agreed that Jeff unduly influenced both of his parents.

The trial court properly concluded that none of Jeff's affirmative defenses barred Jack's petition.

## DISPOSITION

The judgment is affirmed. Appellant to bear his own costs on appeal.


MOORE, ACTING P. J.

WE CONCUR:


MOTOIKE, J.


GOODING, J.

11